**E-FILED**
Tuesday, 15 June, 2010  02:52:02 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEVEN WHITLOW, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04-3211 |
| | ) | |
| TIMOTHY MARTIN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Timothy Martin, Scott Doubet, and Michael Stout's Motion for Summary Judgment (d/e 271) (Motion). The Plaintiffs are sixteen former employees of the Illinois Department of Transportation (Department or IDOT), Steve Whitlow, Bruce Carmitchel, Lori Coonen, Melanie Dennison, Sharmin Doering, Jileen Eisele, Janice Gower, Stuart Hunt II, Brad Jones, Catherine Kennedy, Barbara Mabie, Adil Rahman, Anthony Saputo, Cathy Scaife, Don Williams, and Jason Yoakum.[1]  The Plaintiffs allege that the Defendants

---

[1] A seventeenth Plaintiff, Hank Priester, was voluntarily dismissed from this case. Stipulation of Dismissal with Prejudice of Claims of Plaintiff Hank Priester (d/e 174); Text Order entered May 21, 2008.

violated the Plaintiffs' First Amendment rights by laying off the Plaintiffs from the Department because the Plaintiffs are Republicans.   The Defendants deny this claim and now seek summary judgment.   For the reasons set forth below, the Motion is denied.   Issues of fact exist regarding whether the Defendants laid off the Plaintiffs from the Department because of the Plaintiffs' political affiliation.

## LEGAL STANDARD

Political affiliation generally is not a proper basis for state employment decisions.   Rutan v. Republican Party of Illinois, 497 U.S. 62, 65-66 (1990).   However, political affiliation may be an appropriate consideration for certain positions that involve either policy making or access to confidential information because people in those positions could affect the ability of elected officials to carry out the mandate given by the electorate.   Branti v. Finkel, 445 U.S. 507, 517 (1980); Elrod v. Burns, 427 U.S. 347, 367-68 (1976).   For most jobs, however, political affiliation is not a constitutionally permissible consideration for employment decisions.   Rutan, 497 U.S. at 75.

At summary judgment, the Defendants must present evidence that demonstrates the absence of a genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).   The Court must consider the

evidence presented in the light most favorable to the Plaintiffs.  Any doubt
as to the existence of a genuine issue for trial must be resolved against the
Defendants.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).
Once the Defendants have met their burden, each Plaintiff must present
evidence to show that issues of fact remain with respect to an issue essential
to his or her case, and on which he or she will bear the burden of proof at
trial.  <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

   To make out a prima facie case, the Plaintiffs must present evidence
that they engaged in constitutionally protected activity and that the
protected activity was the reason for the Defendants' conduct.  <u>Hall v. Babb</u>,
389 F.3d 758 (7th Cir. 2004).[2]  If the Plaintiffs can establish these two

---

[2]The Supreme Court previously stated that a plaintiff in a § 1983 case must show
that the protected activity was a substantial or motivating factor for the defendant's
conduct.  <u>Mt. Healthy City School Dist. Board of Education v. Doyle</u>, 429 U.S. 274,
287 (1977).  The Supreme Court recently stated that a plaintiff bringing a claim under
the Age Discrimination in Employment Act (ADEA) must present evidence that age was
the reason for the wrongful conduct, not just a motivating factor.  <u>Gross v. FBL Financial
Services, Inc.</u>, __ U.S.__, 129 S.Ct. 2343, 2351 (2009).  The Supreme Court based this
decision on the language of the ADEA.  <u>Id.</u>  The <u>Gross</u> majority stated that the
"motivating factor" standard established in <u>Mt. Healthy</u> for § 1983 cases had no bearing
on ADEA claims because the language of the statute controlled.  <u>Id.</u>, at 2352, n.6.  The
Seventh Circuit Court of Appeals, however, has now determined that the <u>Gross</u> decision
changed the plaintiff's burden of proof on causation in § 1983 cases from the standard
announced in <u>Mt. Healthy</u> to the standard announced in <u>Gross</u>.  <u>Waters v. City of
Chicago</u>, 580 F.3d 575, 584 (7th Cir. 2009); <u>Fairley v. Andrews</u>, 578 F.3d 518, 525-26
(7th Cir. 2009).  This Court must follow the Seventh Circuit's interpretation of <u>Gross</u>.

elements, the Defendants must present evidence of a legitimate, non-political reason for the employment decision.  Id.  If Defendants present such evidence, the Plaintiffs must present evidence that the stated reason is a pretext, that is a lie, and that political affiliation was the reason for the for the action.  A plaintiff may meet this ultimate burden by presenting evidence of a prima facie case plus evidence of pretext.  Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006).

STATEMENT OF FACTS

After the Rutan decision in 1990, the State of Illinois categorized state jobs as either "Rutan covered" or "Rutan exempt."  See Plaintiffs' Response to Defendants' Motion for Summary Judgment (d/e 292) (Response), Exhibit 12, Deposition of Ellen Schanzle-Haskins, at 265-66.  The positions for which political affiliation could not be considered in making employment decisions were categorized as Rutan covered positions.  The policy making and confidential positions for which political affiliation could be used in making employment decisions were categorized as Rutan exempt positions.

During the end of Republican Governor George Ryan's administration in the summer and fall of 2002, some state employees in Rutan exempt

4

positions accepted voluntary reductions to <u>Rutan</u> covered positions. Plaintiffs Carmitchel, Gower, Hunt, Saputo, Mabie, and Kennedy all accepted voluntary reductions in 2002 from <u>Rutan</u> exempt to <u>Rutan</u> covered positions within the Department.  <u>Motion</u>, Exhibit 105, <u>Affidavit of Robert Anderson</u>, ¶¶ 11-17.  Each of them, except Hunt, maintained the same salary in the new position.  <u>Id.</u>

Democrat Rod Blagojevich became Governor of Illinois in January 2003.  Governor Blagojevich named Defendant Martin as Secretary of the Department.  On February 21, 2003, Martin was flying on a state plane with a person named Louanner Peters.  Robert Bensko was also on the flight.  Bensko states that he overheard Martin tell Peters, "I can't wait to fire every fucking Republican at IDOT."  <u>Response</u>, Exhibit 2, <u>Affidavit of Robert Bensko</u>.

In March 2003, Doubet went to work in the Governor's Office as a Legislative Liaison.  <u>Motion, Attached Exhibits (d/e 278, 279, 280, 281) (Motion)</u>, Exhibit 3, <u>Deposition of Scott Doubet taken September 4, 2008 (First Doubet Deposition)</u>, at 6-7.  Laura Norton also worked in the Governor's Office.  Norton was the liaison for personnel matters between the Governor's Office, Central Management Services (CMS), and state

agencies.  <u>Response</u>, Exhibit 6, <u>Deposition of Laura Norton taken July 22,</u> <u>2009 (First Norton Deposition)</u>, at 17.[3]  According to Norton, Doubet kept a data base of voting records of state employees.  <u>First Norton Deposition</u>, at 75.[4]   Norton also testified in her deposition that Doubet stated repeatedly that he wanted to fire Republicans.  <u>First Norton Deposition</u>, at 70.  In February 2004, Doubet transferred to the Department as the Bureau Chief of the Department's Personnel Management Bureau (Personnel Bureau).  <u>First Doubet Deposition</u>, at 6.

In February 2003, Stout started working for the Department on a contract basis.  On June 16, 2003, Stout became Deputy Director of Finance and Administration for the Department.  <u>Motion</u>, Exhibit 47, <u>Affidavit of Michael Stout</u>, ¶ 3.  Stout investigated employees, such as Plaintiffs Carmitchel, Gower, Hunt, Saputo, Mabie, and Kennedy, who took voluntary reductions from <u>Rutan</u> exempt jobs to <u>Rutan</u> covered jobs.

---

[3]The First Norton Deposition was taken in the state court case of <u>Tumulty v.</u> <u>Blagojevich</u>, Sangamon County, Illinois, Circuit Court No. 09-L-76.

[4]Norton later stated that she did not know if Doubet regularly compared voter registration and voter records.  <u>Reply to Plaintiffs' Response to Motion for Summary</u> <u>Judgment (d/e 295)</u>, Exhibit 1, <u>Deposition of Laura Norton (Second Norton</u> <u>Deposition), taken in Libri v. Blagojevich, Case No. 06-3167</u>, at 40.  For purposes of summary judgment, the Court must view the evidence favorably to the Plaintiffs.  The Court, therefore, must accept Norton's initial statement that Doubet had a data base that contained the voting records of state employees.

Motion, Exhibit 2, <u>Deposition of Michael Stout</u>, at 8, 16, 24-25, 45-48. Stout concluded that the voluntary reductions did not violate any personnel rule or policy.  <u>Id.</u>, at 48.

In early 2004, the Governor's Office of Management and Budget (OMB) directed the Department to reduce its number of employees, or "headcount", by approximately 200 people.  <u>Stout Affidavit</u>, ¶¶ 4, 22. Doubet and Stout were in charge of developing a plan to accomplish the reduction in headcount.  Doubet and Stout reported to Secretary Martin through Robert Millette, the Department's Director of Finance and Administration. <u>Motion</u>, Exhibit 44, <u>Affidavit of Timothy Martin</u>, ¶ 9.  The process was called a Material Reorganization.  The term seems to have come from collective bargaining agreements (CBAs).  The CBAs allowed the Department to eliminate union positions if the Department underwent a material reorganization.  <u>Motion</u>, Exhibit 109, <u>Deposition of Leo Carroll</u>, at 111.  According to Defendants, Doubet and Stout contacted several leaders of organizational units within the Department to secure recommendations for positions to eliminate.  <u>Motion</u>, Exhibit 45, <u>Affidavit of Robert Millette</u>, ¶ 12; <u>Martin Affidavit</u>, ¶ 11.

In March or April 2004, Department employee Tom Kelso claims to

have walked into Doubet's office while Stout and Doubet were talking.
Kelso was hired by the Department in March 2003, after Blagojevich
became Governor. <u>Reply</u>, Exhibit 9, <u>Deposition of Tom Kelso</u>, at 6. Kelso
was a staff assistant for special projects in March 2004. In April 2004,
Kelso became the Bureau Chief for Safety Data in the Division of Traffic
Safety. <u>Id.</u>, at 5-6. According to Kelso, Stout and Doubet stopped talking
and looked at Kelso when he came in. Doubet said something to the effect
of, "It's ok. He's cool." <u>Response</u>, Exhibit 8, <u>Affidavit of Tom Kelso</u>, ¶
12(a). Doubet had in his hand a piece of paper with something printed on
it. Doubet printed off another copy and handed it to Kelso. The paper
consisted of a list of names. Kelso recognized the list as a list of holdover
Department employees from the previous Republican administrations.
Doubet said words to the effect of, "Did we get all of them?" Kelso
understood Doubet to mean all of the Republican holdover employees.
Before and after that conversation, Doubet regularly referred to employees
as "r's" or "them" or "those people", based on the employee's political
affiliation. <u>Kelso Affidavit</u>, ¶ 12(b)-(12(f).[5] The Defendants deny that this

---

[5]Kelso stated in his deposition in 2006 that he had no knowledge of any list of names or of any conversation with Stout. <u>Reply</u>, Exhibit 9, <u>Deposition of Tom Kelso</u>, at 35-38. On May 1, 2009, however, he signed the Affidavit referenced in the text.

meeting happened, and deny the existence of any such list.  <u>Motion</u>, Exhibit 125, <u>Doubet Deposition taken June 25, 2009 (Second Doubet Deposition)</u>, at 43-44.

On May 20, 2004, Karin Smith, the Operations and Classifications Manager within the Personnel Bureau, attended two meetings about the Material Reorganization.  In the morning, she attended a meeting with Doubet and her immediate supervisor Brian Piersma.  In the afternoon, she attended a meeting with Stout and Piersma.  Smith took a page of notes at those meetings.  The notes stated:

> 5.20.04 am Scott Doubet, Brian Piersma, Karin
> *       Add'tl names to add to the lay off plan.
> *       Dick Smith, OPP, won't provide names so this list created
> *       Aero came up w/ top list.  2nd list from Scott
>
> "Here are the names he (Steve Long) gave us.  Here are the names we want."
>
> Then Scott met w/ Mike Stout and requested the hand written copies back.
>
> 5.20.04 pm
> Revised list provided.  Mike made comment
>        "Some are for political reasons.  Some aren't."

---

Kelso stated in the Affidavit that he had denied any knowledge of the list or the conversation with Doubet and Stout because of fear of retaliation.  <u>Kelso Affidavit</u>, ¶¶ 13-16.

Response, Exhibit 1, <u>Karin Smith Notes</u>.  The term "Aero" referred to the Division of Aeronautics, and the term "OPP" referred to the Office of Planning and Programming.  <u>Motion</u>, Exhibit 53, <u>April 19, 2006 Deposition of Karin Smith (First Smith Deposition)</u>, at 103-07; Exhibit 65, <u>August 11, 2009 Deposition of Karin Smith (Second Smith Deposition)</u>, at 61-63, 91-92.  According to Smith, the list referenced in the afternoon meeting was a revision of the handwritten lists discussed in the morning meeting.  The lists concerned employees to be affected by the Material Reorganization who were in the Division of Aeronautics and the Office of Planning and Programming.  Plaintiff Dennison worked in the Office of Planning and Programming; no Plaintiff worked in the Division of Aeronautics.

Stout does not remember making the statement in the afternoon meeting that, "Some are for political reasons.  Some aren't."  <u>Stout Deposition</u>, at 193.  Stout, however, does not doubt the accuracy of Smith's notes.  <u>Id.</u>  Stout stated that he must have been referring to employees on these lists who were in <u>Rutan</u> exempt positions.  <u>Stout Deposition</u>, at 193-94.  According to Smith, the lists discussed at the May 20, 2004, meetings included <u>Rutan</u> covered and <u>Rutan</u> exempt employees.  <u>First Smith Deposition</u>, at 103-07; <u>Second Smith Deposition</u>, at 61-63, 87 -91.

The Department completed the reduction in headcount before the beginning of the fiscal year on July 1, 2004.  <u>Motion</u>, Exhibit 1, <u>Deposition of Timothy Martin (Martin Deposition)</u>, at 75.  The layoff notices to the affected people went out on or about May 24, 2010.  The notice to each Plaintiff stated, in part:

> Your position of [position title] is targeted for abolishment.  The Department has no vacancies to offer you at this time.  Therefore, it is with regret that I inform you that you will be laid off . . . effective close of business June 30, 2004.

<u>E.g.</u>, <u>Motion</u>, Exhibit 50, <u>Notice to Lori Coonen</u>, <u>Exhibit 54</u>, <u>Notice to Melanie Dennison</u>.  The notices, as quoted above, stated that the Department had no vacancies to which the Plaintiffs could apply.  Others affected by the Material Reorganization, however, were transferred to other jobs within the Department or elsewhere in state government.  <u>Response</u>, <u>Statements of Additional Material Facts</u>, ¶¶ 211-17.[6]

The Material Reorganization resulted in a reduction of 166 positions in the Department as of June 30, 2004.  <u>Stout Affidavit</u>, ¶ 22.  Of the 166 positions, 104 were vacant positions that were abolished.  Forty-seven employees were laid off from the remaining positions that were abolished.

---

[6]Defendants agreed that these statements of additional material facts were undisputed.  <u>Reply</u>, Appendix A, <u>Reply to Additional Material Facts</u>, ¶¶ 211-17.

Id.  The Plaintiffs were among the 47 employees who were laid off.  The
Plaintiffs were all working in Rutan covered positions when they were laid
off.  Martin made the final decision on the positions that would be
abolished in the Material Reorganization.  Martin Affidavit, ¶ 13.  The
Defendants, however, admit that each of them was personally involved in
the termination of the Plaintiffs' employment with the Department.
Answer (d/e 14), ¶ 12.  Stout, Doubet, and Martin deny that they knew the
political affiliation of any of the Plaintiffs, except Jones and Scaife.  Martin
Affidavit, ¶ 28; Motion, Exhibit 103, Affidavit of Scott Doubet (Doubet
Affidavit), ¶ 5, Stout Affidavit, ¶ 25.

Leo Carroll, the Recording Secretary and Executive Assistant of
Teamsters Union Local 916, filed a grievance on behalf of the union
members affected by the Material Reorganization.  Motion, Exhibit 35,
Affidavit of Leo Carroll (Carroll Affidavit).  In the course of the grievance
process, Carroll states that he had a telephone conversation with Stout.  It
is unclear when the telephone conversation happened.  Carroll states that
the call occurred between September 2004 and early 2005.  Motion, Exhibit
109, Deposition of Leo Carroll, at 41, 101.  Carroll states that he asked
Stout why these employees were laid off.  According to Carroll, "He replied

that 'these people were political hacks' and also referred to the terminated employees as 'clout people.'" <u>Carroll Affidavit</u>, ¶ 8.  Stout denies that this conversation ever happened.[7]  <u>Stout Affidavit</u>, ¶ 36.

<u>ANALYSIS</u>

The evidence establishes the Plaintiffs' prima facie case when viewed in the light most favorably to them.  For purposes of summary judgment, the Defendants do not dispute that every Plaintiff worked in a position for which political affiliation was not an appropriate consideration for

---

[7]The Plaintiffs submit evidence from various witnesses who state that other Department employees and state employees from the Governor's Office and elsewhere in state government made additional statements that support the Plaintiffs' claims.  The Defendants object to this evidence as hearsay.  The Court does not consider this evidence.  As explained in the Opinion, the Motion must be resolved in favor of the Plaintiffs regardless of whether the Court considers these additional statements.  The Court does not rule on the Defendants' objections at this time because issues exist regarding admissibility that have not been briefed adequately by the parties.  The statements by individuals who did not work for the Department would normally be hearsay and incompetent to oppose summary judgment.  <u>Fed. R. Civ. P.</u> 56(e).  The statements by Department employees would also normally be hearsay as to Martin in his personal capacity and as to Stout and Doubet.  The statements by Department employees may be non-hearsay admissions as to Martin in his official capacity as Secretary of the Department to the extent that the statements were made in the course of the employee's agency and within the scope of that agency.  <u>See</u> <u>Fed. R. Evid</u>. 801(d)(2)(D).  The Plaintiffs also argue that the Defendants were part of a conspiracy with other individuals in state government.  Upon the proper showing, the existence of such a conspiracy could affect the admissibility of statements by co-conspirators.  <u>See</u> <u>United States v. Santiago</u>, 582 F.2d 1128, 1131-32 (7th Cir. 1978), (overruled on other grounds, <u>Bourjaily v. United States</u>, 483 U.S. 171 (1987)).  The parties have not briefed these issues, and resolution of these issues is unnecessary at this time because summary judgment must be denied regardless of whether the Court considers the evidence to which the Defendants object.

employment decisions.  All of the Plaintiffs engaged in protected activity by participating in the political process as members of the Republican Party. Martin, Stout and Doubet were personally involved in the decision to terminate the Plaintiffs' employment with the Department, although Martin made the final decision.  According to the Plaintiffs, Doubet kept a data base of voting records of state employees, and so, had a record of state employees who voted in the Republican primaries.  Martin and Doubet stated at various points in time that they wanted to fire Republicans in state government.  In March or April 2004, Stout and Doubet showed Kelso a list of holdover employees from prior Republican administrations and asked, "Did we get all of them?" Doubet referred to employees as "r's", "them", and "those people" based on their political affiliation.  At the May 20, 2004, meeting, Stout stated that some of the planned lay-offs were political. Within a matter of days, all of the Plaintiffs were laid off.  The Plaintiffs were treated worse than other laid-off employees because they were denied the opportunity to seek employment elsewhere in the Department.  Some other laid-off employees were offered other jobs in the Department or elsewhere in state government.  Later, Stout told Carroll that they used the Material Reorganization to lay off "political hacks" and "clout people."  This

evidence, when read favorably to the Plaintiffs, indicates that the Defendants opportunistically used the OMB directive as a pretext to fire Republican "political hacks" and "clout people."  This evidence is controverted and subject to serious questions of credibility.  Any weakness in the evidence, however, is for a jury to evaluate.  The evidence creates an issue of fact with respect to the Plaintiffs' prima facie case.

Next, the Defendants have presented evidence of a legitimate, non-political reason for the layoffs.  The layoffs were part of the Material Reorganization designed to meet the directive from OMB to reduce headcount.  The Material Reorganization, in fact, reduced headcount in the Department.  The Defendants, further, state that they did not use political affiliation as a factor is choosing the positions to abolish.  The Defendants, therefore, met their burden of showing the existence of a legitimate, non-political reason for the payoff.

The Plaintiffs, however, have presented evidence of pretext.  Stout and Doubet handed Kelso the list of holdover employees and asked, "Did we get all of them?"  Stout stated on May 20, 2004, that some of the firings were political.  Stout told Carroll that they used the Material Reorganization to lay off "political hacks" and "clout people."  The Defendants argue that this

evidence is insufficient to establish pretext.  However, this evidence, when read favorably to the Plaintiffs, indicates that the Defendants used the OMB directive to reduce headcount as a pretext to accomplish their political goal to fire Republicans.  The Defendants fired the Republicans and told them they need not apply for work elsewhere in the Department.  This evidence creates an issue of fact.  The Plaintiffs are entitled to proceed to trial.

The Defendants argue that they never knew the political affiliation of any Plaintiff except Plaintiffs Bradley and Scaife.[8]  The Plaintiffs' evidence, however, indicates that Doubet kept a data base of state employee voting records.  This evidence supports the inference that he knew the political affiliation of state employees based on whether the employees voted in the Democratic or Republican primaries.  Kelso's Affidavit supports the inference that Doubet referred to Republicans at the Department as "r's", "them", and "those people".  This evidence supports the inference that

---

[8]The Defendants also argue that the Plaintiffs changed their theory at summary judgment to assert that the Defendants fired them because they did not support Governor Blagojevich rather than firing them because they were Republicans.  See Reply, at 5-12.  The Plaintiffs made some arguments about being fired for not supporting Governor Blagojevich.  See e.g., Response, at 3.  The Plaintiffs, however, did not concede that the Defendants did not know the Plaintiffs' political affiliations and did not waive their original theory that the Defendants laid off the Plaintiffs because the Plaintiffs were Republicans.

Doubet knew the identity of the Republicans at the Department.  Doubet worked with both Stout and Martin to identify the state employees who would lose their jobs in the Material Reorganization.  Martin also declared his desire to fire every Republican in the Department.  Stout told Carroll that they laid off "political hacks" and "clout people" in the Material Reorganization.  This evidence, if believed, would support the inference that Doubet shared his information regarding the political affiliation of state employees.  The evidence, at least, creates an issue of fact.

The Defendants argue that the Plaintiffs failed to prove causation.  Again, the Court disagrees.  The Affidavits of Kelso and Carroll, if believed, shows that the Defendants used the Material Organization to "get all of them" (i.e., Republican employees) and lay off "political hacks" and "clout people".  This evidence supports the conclusion that the Defendants picked out the employees to lay off and get rid of based on the employee's political affiliation.  The evidence is sufficient to create an issue of fact on the question of causation.

The Defendants argue that Stout, at the May 20, 2004, meeting, was referring to employees in <u>Rutan</u> exempt positions when he said that some of the layoffs were political.  The state categorized as <u>Rutan</u> exempts those

policy making and confidential jobs for which the state determined that political considerations could be used in making employment decisions. The notes of the May 20, 2004, meeting are not very strong evidence for the Plaintiffs. The meeting concerned the Division of Aeronautics and the Office of Policy and Planning. Only one of the Plaintiffs worked in either of these units within the Department. The May 20, 2004, notes do not identify the positions to which Stout was referring when he said that some of the layoffs were political. The lists discussed at the meetings included both <u>Rutan</u> exempt and <u>Rutan</u> covered employees. Some individuals were, in fact, laid off from <u>Rutan</u> exempt positions in the Material Reorganization. At this point, the Court must read the evidence favorably to the Plaintiffs. When so read, the notes serve as corroboration of the statements that Defendants Doubet and Stout allegedly made to Kelso and Carroll.

The Defendants argue that the Court should not consider Kelso's Affidavit because Kelso's Affidavit contradicts his prior deposition testimony. Kelso was deposed in 2006. At that time, he denied seeing a list of employees and denied being in a meeting with Stout. <u>Kelso Deposition</u>, at 35-38. The Defendants argue that the Plaintiffs cannot use Kelso's Affidavit to contradict his earlier deposition testimony.

18

The Court has discretion to decide whether to consider an affidavit that contradicts prior testimony.  Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 723 (7th Cir. 1998).  The Court must use caution in exercising its discretion to exclude affidavits because the Court should not weigh credibility at summary judgment.  Bank of Illinois v . Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1169-70 (7th Cir. 1996).  The finder of fact should generally decide the credibility of a witness.  A party who regrets something he says in a deposition, however, should not be able to manufacture a sham affidavit to contradict the deposition just to avoid summary judgment.  Id.  The Court, therefore, must determine whether Kelso's Affidavit constitutes a sham affidavit that should not be considered at summary judgment.  Id., at 1173-74 (Cudahy, J., concurring).

In this case, Kelso's Affidavit is not a sham fabricated only to defeat summary judgment.  Parties, or a person connected to a party, typically generate such sham affidavits to respond to a summary judgment motion, and assert only conclusory denials of statements that the affiant made in his or her deposition.  See e.g., Id. (affidavit executed by parents of the minor plaintiff); Patterson, 150 F.3d at 723-24 (affidavit prepared by the plaintiff in response to a summary judgment motion).  Kelso's Affidavit is quite

different from these typical sham attempts to create an issue of fact.  Kelso did not prepare his Affidavit in response to the Motion.  Kelso executed his Affidavit on May 1, 2009, over eight months before the Defendants filed the Motion.  Kelso had no personal interest in the outcome of the case, so he had no reason to create a sham affidavit.  If anything, Kelso acted against his own interest by executing the Affidavit.  Kelso worked for the Department in 2009 when he executed his Affidavit.[9]  If the Plaintiffs prevail, the Department, through the Secretary, may be enjoined to re-hire the Plaintiffs.  Kelso, thus, acted contrary to the interests of his employer by signing the Affidavit.

Kelso's Affidavit was not conclusory.  Kelso described the alleged meeting with Doubet and Stout, and the alleged list.  He also explained why he testified differently at his deposition.  He explained his alleged efforts to rectify his lack of forthrightness at the deposition.  This level of detail further indicates that the Affidavit is not a sham thrown together to avoid summary judgment.  See Bank of Illinois, 75 F.3d at 1173-74 (Cudahy, J. concurring).  Given these circumstances, the Court exercises its discretion and allows the Plaintiffs to use Kelso's Affidavit to oppose summary

---

[9]The record does not indicate Kelso's current employment status.

judgment.  The Court is convinced that the jury should decide Kelso's credibility under these circumstances, not the Court.

The Defendants also complain that Kelso did not attach the claimed list of names to his Affidavit.  The Plaintiffs also have not otherwise submitted the alleged list of names in evidence.  The Court agrees that the list of names cannot be considered as evidence unless a properly authenticated copy is submitted.  Fed. R. Civ. P. 56(e).  Even without the list, however, Kelso's Affidavit contains relevant evidence.  Kelso's Affidavit contains Doubet's statement to Kelso, "Did we get all of them?", and Doubet's regular reference to employees as "r's" or "them" or "those people", based on the employee's political affiliation.  Those statement are admissions of a party opponent and clearly admissible.  Fed. R. Evid. 801(d)(2).  The Court considers those statements in Kelso's Affidavit as the substantive evidence in opposition to the Motion.  The Court considers Kelso's description of the purported list only for the limited purpose of explaining the context of Doubet's reference to getting all of "them".  The Defendants are correct that the list itself is not in evidence.[10]

---

[10]The Defendants also argue that the Kelso Affidavit is not a proper supplement to his deposition.  See Fed. R. Civ. P. 30(e).  The Court agrees that the Kelso Affidavit is not a supplement to his deposition under Rule 30(e).  That observation does not affect

The Defendants also complain about the Plaintiffs' use of the First Norton Deposition taken in an unrelated matter. The Defendants complain that they did not get the opportunity to cross examine Norton. The First Norton Deposition is properly before the Court. Norton's testimony was under oath. As such, the deposition is competent evidence to oppose a motion for summary judgment. Fed. R. Civ. P. 56(e). The lack of cross examination is not determinative; affidavits are not subject to cross examination, but may be used to oppose summary judgment. Cf., Corley v. Rosewood Care Center, Inc., 142 F.3d 1041, 1052 (7th Cir. 1998) (taking sworn statements in front of a court reporter, but without the presence of opposing counsel, can be an appropriate method of gathering information during discovery). The Plaintiffs disclosed the First Norton Deposition in discovery. Reply, at 23. The Defendants subsequently deposed Norton in a related case. Id. The Plaintiffs, therefore, may use the First Norton Deposition to oppose summary judgment.

The Defendants argue that the Plaintiffs admit the Defendants' Statement of Undisputed Fact No. 228 (Paragraph 228) that the Defendants had no knowledge of a scheme from the Governor's Office to

---

whether the Affidavit is competent evidence to oppose the Motion.

fire Republicans throughout state government and replace them with Democrats. The Plaintiffs did not deny Paragraph 228 and so, are deemed to have admitted the statements in Paragraph 228 for purposes of summary judgment. Local Rule 7.1(D)(2)(b)(6). The admission for purposes of summary judgment, however, is not determinative. The evidence discussed above, when viewed favorably to the Plaintiffs, supports the inference that the Defendants used the OMB directive as a pretext to fire Republicans. If so, the Defendants violated the Plaintiffs' First Amendment rights. Rutan, 497 U.S. at 65-66; Branti, 445 U.S. at 515-16; Elrod, 427 U.S. at 373. The Plaintiffs do not need to prove a government-wide scheme to establish a violation of their rights.

The Defendants also argue that they are entitled to qualified immunity. The Court disagrees. A defendant is entitled to qualified immunity to a § 1983 claim unless the plaintiff can show that the defendant: (1) violated the plaintiff's rights; and (2) controlling authority existed at the time that clearly established that the defendant's conduct violated the plaintiff's rights. Saucier v. Katz, 533 U.S. 194, 201 (2001). As set forth above, the Plaintiffs have demonstrated that issues of fact exist regarding whether the Defendants laid off the Plaintiffs from their jobs with

the Department on June 30, 2004, because the Plaintiffs were Republicans. By June 30, 2004, the Supreme Court had clearly established that firing a state employee because of his political affiliation violated the First Amendment. <u>Rutan</u>, 497 U.S. at 65-66; <u>Branti</u>, 445 U.S. at 515-16; <u>Elrod,</u> 427 U.S. at 373. The political affiliation of an employee could only be considered if the employee was in a policy making or confidential position for which political affiliation was an appropriate consideration. <u>Branti,</u> 445 U.S. at 517. The Defendants concede for purposes of the Motion that the Plaintiffs' jobs were not the type for which political affiliation was an appropriate consideration for employment decisions. The controlling authority of <u>Rutan</u>, <u>Elrod</u> and <u>Branti</u>, therefore, put the Defendants on notice that firing the Plaintiffs because they were Republicans violated the First Amendment. If the jury believes the Plaintiffs' version of the evidence, there is no qualified immunity. The Defendants are not entitled to summary judgment based on the qualified immunity defense.

Finally, the Defendants ask for partial summary judgment on the equitable claims of the Plaintiffs who took voluntary reductions in 2002 from <u>Rutan</u> exempt to <u>Rutan</u> covered positions. Defendants argue that these Plaintiffs come to the Court with unclean hands. <u>See</u> <u>Precision</u>

Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945) ("The guiding doctrine . . . is the equitable maxim that 'he who comes into equity must come with clean hands.'").  According to Defendants, these Plaintiffs used their political affiliations to get their Rutan exempt positions initially.  When Governor Ryan's term was ending, they maneuvered themselves into Rutan covered positions to protect their jobs from the same political considerations that they used to secure state employment in the first place.  The Defendants argue that this type of manipulation of the system is inequitable conduct that should preclude them from coming to the Court now to seek equitable relief.

The Defendants' evidence supports the inference that these Plaintiffs manipulated the system to their advantage.  Defendant Stout, however, stated in his deposition that he investigated these voluntary reductions and concluded that they did not violate any personnel rule or policy.  Assuming the Plaintiffs did not violate any rule, an issue of fact exists regarding whether these Plaintiffs did anything that would make them subject to the unclean hands doctrine.  The request for partial summary judgment on this issue is also denied.

THEREFORE, Defendants Timothy Martin, Scott Doubet, and

Michael Stout's Motion for Summary Judgment (d/e 271) is DENIED.

Plaintiffs' Motion to Strike Motion for Summary Judgment (d/e 285) is

DENIED as moot.

IT IS THEREFORE SO ORDERED.

ENTER:  June 15, 2010

   FOR THE COURT:


        s/  Jeanne E. Scott
        JEANNE E. SCOTT
      UNITED STATES DISTRICT JUDGE